UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

ABBY ROBINSON AND                                              PLAINTIFFS
RICKY ROBINSON

V.                                    CIVIL ACTION NO. 3:21-CV-195-DPJ-LGI

RIVERHILLS BANK, ET AL.                                        DEFENDANTS

ORDER

Defendant RiverHills Bank extended three loans to Plaintiffs Abby and Ricky Robinson,
including an unsecured loan in 2020 (the "Loan Agreement") advanced so that the Robinsons
could meet their obligations under a 2016 mortgage-backed loan.  This suit claims that
RiverHills violated federal law by failing to make required disclosures before consummating the
unsecured Loan Agreement and by offering terms for that loan less favorable than those given to
white or male borrowers.  The Robinsons also contend that RiverHills and Defendants Lewis
Watt and Law Security Group (LSG) committed various state-law torts when attempting to
remove the Robinsons from their home after foreclosure.  RiverHills has moved for summary
judgment, seeking dismissal of the federal-law claims and encouraging the Court to decline
supplemental jurisdiction over the state-law claims.  Mot. [65].  Watt and LSG have jointly
moved to dismiss on jurisdictional grounds.  Mot. [39].  The Court concludes that both motions
should be granted.

I.      Background

On October 14, 2016, RiverHills and the Robinsons entered into a loan agreement
secured by a deed of trust encumbering the Robinsons' home.  Kaufman Aff. [65-1] ¶ 2; *see*
Deed of Trust [74-3].  The agreement required the Robinsons to supplement monthly mortgage
installments with monthly contributions to an escrow reserve to cover taxes, liens, and other

charges on the burdened property.  Kaufman Aff. [65-1] ¶ 3.  RiverHills set the contribution amount based on its estimate of those charges.  *Id.*  It also annually performed an escrow analysis, adjusting the contribution rate based on any shortages (estimated shortfalls between the current balance and future charges due) or deficiencies (current overdrafts).  *See id.* ¶ 4.[1]

In 2018, two years into the loan term, RiverHills discovered that the taxes assessed against the property had more than tripled.  *Id.* ¶ 5.  As a result, there was a deficiency and shortage on the escrow reserve.  *Id.*  The Robinsons faced a choice:  (1) make a lump-sum payment or (2) have their monthly mortgage payments increased by "one-twelfth of [any] shortage and deficiency," a rate RiverHills says the "[a]pplicable regulations require[d]."  *Id.* ¶¶ 4–5.

The Robinsons chose the lump-sum option, but they paid off only the deficiency, not the shortage.  *Id.* ¶ 6.  As such, another deficiency (and shortage) accrued by the next year.  *Id.* ¶ 7. Faced with the same choice, the Robinsons again sought to make a lump-sum payment.  *Id.*  This time, however, they required additional financing to make that payment—financing they sought from RiverHills.  *Id.* ¶¶ 7–8.

---

[1] As defined by Regulation X:

> Deficiency is the amount of a negative balance in an escrow account.
> . . . .
> Shortage means an amount by which a current escrow account balance falls short of the target balance at the time of escrow analysis.
> . . . .
> Target balance means the estimated month end balance in an escrow account that is just sufficient to cover the remaining disbursements from the escrow account in the escrow account computation year, taking into account the remaining scheduled periodic payments, and a cushion, if any.

12 C.F.R. § 1024.17(b).

Initially, RiverHills explored raising the Robinsons' credit limit on their 2017 home-equity line of credit (HELOC); ultimately though, it chose to provide a new unsecured loan, advancing $17,700 at an 8.49% interest rate and a three-year loan term.  *Id.* ¶ 8; *see also* 2020 Loan Agreement [65-1] at 9.[2]  Payments on the Loan Agreement were to begin on April 5, 2020. *Id.* at 9.  But no payment was ever made:  the Robinsons entered bankruptcy, and the 2020 loan was discharged.  *Id.* ¶ 11.

Before the bankruptcy court, RiverHills filed a motion for relief from the automatic stay so it could foreclose on the 2017 deed of trust.  Sadler Aff. [65-2] ¶ 4.  The Robinsons did not object, and, on July 24, 2020, the court entered an order allowing foreclosure.  *Id.*  At the foreclosure sale—which was not held until February 5, 2021—RiverHills purchased the property.  *Id.* ¶¶ 5–6.  After negotiations broke down over a vacate deadline, RiverHills filed an unlawful-entry-and-detainer action in county court.  *Id.*

The Robinsons agreed to surrender the property prior to the hearing date, *id.* ¶ 8, but they also filed this suit related to the loans and RiverHills's efforts to remove them from the foreclosed property.  Specifically, they claim the bank failed to make disclosures required by the Truth in Lending Act (TILA), 15 U.S.C. §§ 1601–67f, as implemented by Regulation Z, 12 C.F.R. pt. 1026, and as amended by the Home Ownership and Equity Protection Act (HOEPA), 15 U.S.C. § 1602(bb); violated the Equal Credit Opportunity Act (ECOA), 15 U.S.C. §§ 1691–91f by discriminating against the Robinsons based on race and gender; violated federal COVID foreclosure and eviction moratoria; and either committed or is vicariously responsible for various state-law torts related to the unlawful-entry-and-detainer action.  They also sue Watts and LSG

---

[2] RiverHills introduced the Loan Agreement as an attachment to Laura Kaufman's Affidavit [65-1].  For brevity, the Court will refer to the attachment as "Loan Agreement [65-1]."

for that same service-related conduct.  RiverHills seeks summary judgment; Watts and LSG seek

dismissal.  The Court has federal-question jurisdiction to consider the federal claims and

therefore begins with RiverHills's summary-judgment motion as to those claims.

II.     Rule 56 Standard

Summary judgment is warranted under Federal Rule of Civil Procedure 56(a) when

evidence reveals no genuine dispute regarding any material fact and that the moving party is

entitled to judgment as a matter of law.  The rule "mandates the entry of summary judgment,

after adequate time for discovery and upon motion, against a party who fails to make a showing

sufficient to establish the existence of an element essential to that party's case[] and on which

that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322

(1986).

The party moving for summary judgment "bears the initial responsibility of informing the

district court of the basis for its motion[] and identifying those portions of [the record] which it

believes demonstrate the absence of a genuine issue of material fact."  *Id.* at 323.  The

nonmoving party must then "go beyond the pleadings" and "designate 'specific facts showing

that there is a genuine issue for trial.'"  *Id.* at 324 (citation omitted).  In reviewing the evidence,

factual controversies are to be resolved in favor of the nonmovant, "but only when . . . both

parties have submitted evidence of contradictory facts."  *Little v. Liquid Air Corp.*, 37 F.3d 1069,

1075 (5th Cir. 1994) (en banc).  When such contradictory facts exist, the court may "not make

credibility determinations or weigh the evidence."  *Reeves v. Sanderson Plumbing Prods., Inc.*,

530 U.S. 133, 150 (2000).  It must "interpret all facts and draw all reasonable inferences in favor

of the nonmovant."  *EEOC v. Rite Way Serv.*, 819 F.3d 235, 239 (5th Cir. 2016); *accord Tolan v.*

*Cotton*, 572 U.S. 650, 660 (2014).  But conclusory allegations, speculation, unsubstantiated

4

assertions, and legalistic arguments have never constituted an adequate substitute for specific facts showing a genuine issue for trial. *TIG Ins. Co. v. Sedgwick James of Wash.*, 276 F.3d 754, 759 (5th Cir. 2002) (citing *SEC v. Recile*, 10 F.3d 1093, 1097 (5th Cir. 1993)); *accord Little*, 37 F.3d at 1075.

III.    Analysis of Federal Claims Against RiverHills

    A.    TILA/Regulation Z/HOEPA Claims

The Robinsons allege that RiverHills failed to make certain disclosures in the Loan Agreement and thereby violated TILA, Regulation Z, and HOEPA. RiverHills, however, says these claims are time barred and otherwise meritless. This Order begins with the asserted procedural defect.

TILA promotes the "informed use of credit . . . [by] assur[ing] a meaningful disclosure of credit terms." 15 U.S.C. § 1601(a). *See generally Rosenfield v. HSBC Bank, USA*, 681 F.3d 1172, 1179–80 (10th Cir. 2012). "The regulations implementing TILA are known as 'Regulation Z.'" *Billings v. Propel Fin. Servs., L.L.C.*, 821 F.3d 608, 609–10 (5th Cir. 2016); *see* 15 U.S.C. § 1604(a); 12 C.F.R. § 1026.1(a). HOEPA, enacted in 1994, amended TILA to impose additional disclosure obligations for high-cost mortgages. *See McLeod v. PB Inv. Corp.*, 492 F. App'x 379, 386 n.5 (4th Cir. 2012); *Hopson v. Chase Home Fin. LLC*, 14 F. Supp. 3d 774, 794–85 (S.D. Miss. 2014); *see also* 15 U.S.C. § 1639. Thus, TILA's procedural requirements cover Plaintiffs' HOEPA-based claims as well.

Under TILA, plaintiffs must bring an action "within one year from the date of the occurrence of the [alleged] violation" unless certain inapplicable exceptions apply. 15 U.S.C. § 1640(e). "[A] TILA claim accrues when the loan is consummated or at the closing on the loan transaction." *Jackson v. Standard Mortg. Corp.*, No. 6:18-CV-927, 2019 WL 6769361, at *7 &

n.48 (W.D. La. Dec. 11, 2019) (compiling sources); *see also McCrimmon v. Wells Fargo Bank, N.A.*, 516 F. App'x 372, 375 (5th Cir. 2013) (holding that TILA claims accrued when loans "were executed").  Here, RiverHills contends that the Loan Agreement closed on February 20, 2020, when the Robinsons signed the Loan Agreement, yet suit was not filed until March 17, 2021, more than a year later.  RiverHills's Mem. [66] at 12–13.  The parties dispute the closing date.

As RiverHills notes, February 20, 2020 appears three times in the Loan Agreement. RiverHills's Reply [87] at 2.  The first reference is printed at the very top of page one under the heading "TRANSACTION DATE":

| LOAN NUMBER | TRANSACTION DATE | PRINCIPAL AMOUNT | MATURITY DATE | INTEREST RATE |
|---|---|---|---|---|
| 5588777 | February 20, 2020 | $17,700.00 | March 5, 2023 | 8.490% |
| LOAN PURPOSE: PAY MORTGAGE ESCROW SHORTAGE AND DEFICIENCY | | | | |

Loan Agreement [65-1] at 9.  That same page also indicates that "[i]nterest will begin to accrue on February 20, 2020."  *Id.*  Moreover, Laura Kaufman (who executed the Loan Agreement for the bank as its vice president) hand-dated her signature February 20, 2020.  *See* RiverHills's Mem. [66] at 12; RiverHills's Reply [87] at 2; *see also* Loan Agreement [65-1] at 9–10.

RiverHills also supports the transaction date through Kaufman's declaration that "[o]n or about February 20, 2020, the Robinsons executed [the Loan Agreement]."  Kaufman Aff. [65-1] ¶ 9.  And the document itself bears the Robinsons' initials and signatures:

| TYPE | PREMIUM AMOUNT | TERM | CHOICE | SIGNATURES/INITIALS |
|---|---|---|---|---|
| Credit Life | | n/a | I DO NOT want Credit Life Insurance | |
| Credit Disability | | n/a | I DO NOT want Credit Disability Insurance | |

Loan Agreement [65-1] at 9.

*Id.* at 10.

But the Robinsons say the bank fraudulently made up the February 20, 2020 transaction date to trigger the limitation period. While the Court will address their arguments, the evidence they cite does not support the inferences they suggest. Although the Court must generally view evidence under Rule 56 "in the light most favorable to the nonmoving party," *Scott v. Harris*, 550 U.S. 372, 380 (2007), that applies "only if there is a 'genuine' dispute as to those facts," *id.* (quoting Fed. R. Civ. P. 56(c)). "When the moving party has carried its burden under Rule 56(c)," as RiverHills has done here, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* And when "the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Id.* (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–587 (1986)). With that, the Court turns to Plaintiffs' contentions.

First, although the Robinsons never *directly* deny signing the Loan Agreement in their memorandum—or with record evidence—they try to cast doubt on that fact. According to them, they dated their signatures on their Deed of Trust, thus creating "genuine facts that seem[] to contradict the required express date *and signature* of the subject loan." Pls.' Opp'n Mem. [75] ¶ 16 (emphasis added) (citing Deed of Trust [74-3] at 7). That sounds like a round-about way of saying they never signed the Loan Agreement. But, if true, then they would have no TILA claim related to the loan because it was never consummated under Regulation Z. *See, e.g.*, *Clark v.*

*Troy and Nichols, Inc.*, 864 F.2d 1261, 1263–64 (5th Cir. 1989) (TILA claims can be maintained only where a loan transaction has been consummated).

Regardless, the Robinsons offer no record evidence—like an affidavit—swearing that their initials and signatures on the Loan Agreement are forgeries.  By contrast, Kaufman swore in her affidavit that the Robinsons executed the signatures that appear on the Loan Agreement on or about February 20, 2020.  Kaufman Aff. [65-1] ¶ 9.  The fact that the Robinsons dated other documents is not enough to establish a fact question whether they signed this one, especially without *any* other record evidence to support the assertion.  Arguments are no substitute for evidence.  *TIG Ins. Co.*, 276 F.3d at 759.

Second, the Robinsons say Kaufman's hand-dated signature on the Loan Agreement fails to establish the closing date because there are no dates next to the Robinson's signatures.  Pls.' Opp'n Mem. [75] ¶ 15 (citing 2020 Loan Agreement [74-2] at 3).  But the Robinsons' failure to date their own signatures does not rebut Kaufman's hand-dated signature or her affidavit swearing that the Robinsons signed on or about February 20, 2020.  And Kaufman's hand-written signature is not the only reference to the consummation date—February 20, 2020, is twice printed on the first page of the loan.  Abby Robinson is an attorney, and there is no explanation why she would sign the agreement if the stated transaction date was wrong—especially when it stated that interest would accrue from that date.  The lack of dates next to the Robinsons' signatures does not create a material dispute.

Third, the Robinsons rely heavily on a February 25, 2020 email from Kaufman to Abby Robinson.  Pls.' Opp'n Mem. [75] ¶¶ 8–11 (citing February 25 Kaufman Email [74-6] at 1).  The subject line of the email is "Mortgage Payment," and the body reads:

HI,

> We have finally got it straight.
>
> We have rolled the January payment to February.  We had to roll the payment because it was $2,615.00 short.  Loan is currently due for February 10th.  We will need one full payment for February in the amount of $5,715.00.  See attached.  New loan payment will begin in March for a total of $3,864.00 Principal, Interest, Taxes and Insurance.  See attached new Escrow Analysis Statement.
>
> Call me if you have any questions,
>
> Laura

Feb. 25 Kaufman Email [74-6] at 1.  The Robinsons say this email refutes the proffered transaction date because it shows that the Loan Agreement was still being "processed."  Pls.' Opp'n Mem. [75] ¶ 8.

To begin, it is not apparent this email addresses the 2020 unsecured Loan Agreement rather than the Robinsons' 2016 mortgage-backed loan.  The email's subject line states, "Mortgage Payment," and the text plainly addresses at least some payments that were due before the Loan Agreement existed.  Even assuming this message also relates to the Loan Agreement, it indicates a consummation date no later than the date the email was sent (February 25), which is still outside the one-year statutory window that began March 17, 2020.

Also, there is no suggestion in the email that the disputed loan was still being "processed," as the Robinsons claim.  *See* Pls.' Opp'n Mem. [75] ¶ 8.  To the contrary, the email says that as of February 25, the bank had gotten things "straight," and Kaufman conveys exact amounts due.  Feb. 25 Kaufman Email [74-6] at 1.  Even if the email could be construed to say the Loan Agreement was still being processed on February 25, 2020, Plaintiffs offer no legal authority suggesting that TILA claims toll while a bank processes an executed loan.  As noted, the statute runs from the "occurrence of the [alleged] violation," 15 U.S.C. § 1640(e), which, in the context of a failure to disclose, would necessarily occur when the loan is consummated or

"executed," *McCrimmon*, 516 F. App'x at 375.  In short, the email casts no doubt on the Loan Agreement's twice-printed transaction date, Kaufman's hand-dated signature, or Kaufman's sworn declaration.[3]

Fourth, the Robinsons say February 20, 2020, couldn't have been the transaction date because the first payment on the loan was due April 5, 2020, and, they say, "[t]he loan require[d] the first payment 30 days from the transaction date." *Id.* ¶ 8 & n.3.  The Robinsons cite no record evidence establishing that 30-day requirement.  But if their argument is factually correct, it proves RiverHills is entitled to summary judgment because the date one month before April 5, 2020, was March 5, 2020.  The Robinsons filed their suit on March 17, 2021, more than one year later.

Fifth, the Robinsons submit a *copy* of the Loan Agreement that they received at some point, noting that it lacks any signatures.  *Id.* ¶ 15.  If they mean to suggest that the signed and dated version is false, then, as with their dispute over the signatures, an unconsummated loan cannot create TILA liability.  *See, e.g.*, *Clark*, 864 F.2d at 1263–64.  And if the signed copy is false, the Robinsons would have the burden of producing evidence that the loan was consummated at some point, yet they offer no evidence of an alternative consummation date.  In any event, a pre-execution copy proves nothing.

---

[3] Throughout their memorandum, the Robinsons offer other interpretations of the email, but none alter the result.  For example, Plaintiffs suggest that the email "stat[es] that the . . . loan closing will be in March."  Pls.' Opp'n Mem. ¶ 24.  But the email says no such thing, and Plaintiffs offer no record evidence supporting that assertion.  In the next paragraph, the Robinsons argue that the email indicates that their payments on the new loan were scheduled to "begin in March[] 2020, **not** the **APRIL**[] **2020** [date] **found in** [the Loan Agreement]."  *Id.* ¶ 25.  That might suggest that the "Mortgage Payment" email addresses the mortgage loan with the new escrow amounts and not the new unsecured Loan Agreement.  But even if the email indicates that the first payment under the Loan Agreement would be in March, that still suggests the Robinsons signed the Loan Agreement no later than February 25 when Kaufman sent the email.  Their claim would still be untimely.

Plaintiffs also suggest that the absence of signatures and dates on the *copy* is relevant because the document's signature line states:  "By signing this Note on the date shown below, I acknowledge reading, understanding, and agreeing to all of its provisions, and receiving a completely filled in copy of this Note."  Pls.' Opp'n Mem. [75] ¶ 16 (quoting Loan Agreement [65-1] at 10).  The Robinsons seem to argue that "completely filled in" implies signed and dated, not just containing the terms of the agreement.  *Id.* ¶¶ 15–16, 24.  But again, there is an executed copy of the Loan Agreement that has not been disputed with record evidence.  Arguments are not enough.  *TIG Ins. Co.*, 276 F.3d at 759.  More critically, even the *copy* features the same printed transaction date as the signed version—February 20, 2020.  *See* 2020 Loan Agreement Copy [74-1] at 1.  The unsigned copy casts no doubt on RiverHills's undisputed record evidence establishing the consummation date.

In short, if the Robinsons signed the Loan Agreement on a different date, then they could have easily met their burden under Rule 56(c) by providing sworn affidavits establishing that fact questions and producing the real signed and dated copy of their loan.  They offer no such evidence, and "[u]nsworn pleadings, memoranda or the like are not . . . competent summary judgment evidence."  *Larry v. White*, 929 F.2d 206, 211 n.12 (5th Cir. 1991).

The Robinsons offer a final limitations argument—presumably in the alternative—that if they failed to file before the statute ran, then equitable tolling applies.  Pls.' Opp'n Mem. [75] ¶¶ 9–11.  Equitable tolling "is appropriate 'only in rare and exceptional circumstances,' especially 'where the plaintiff is actively misled by the defendant about the cause of action or is prevented in some extraordinary way from asserting [her] rights.'"  *McCrimmon*, 516 F. App'x at 375 (quoting *Teemac v. Henderson*, 298 F.3d 452, 457 (5th Cir. 2002)) (affirming refusal to apply equitable tolling to TILA claim).  The party seeking equitable tolling carries the burden of

demonstrating its appropriateness.  *See In re Deepwater Horizon*, No. 20-30673, 2021 WL 4888395, at *2–3 (5th Cir. Oct. 19, 2021) (per curiam) (citing *Pace v. DiGuglielmo*, 544 U.S. 408, 418 (2005)).  And that includes evidence that they "pursu[ed] [their] rights diligently." *Menominee Indian Tribe of Wis. v. United States*, 577 U.S. 250, 255, 257 n.2 (2016) (quoting *Holland v. Florida*, 560 U.S. 631, 649 (2010)).

Here, the Robinsons again rely on Kaufman's February 25, 2020 "Mortgage Payment" email.  This argument necessarily assumes that the statute needs tolling—i.e., that they in fact consummated the Loan Agreement before March 17, 2020.  Yet the Robinsons fail to adequately explain how the Mortgage Payment email mislead them about their cause of action.  If the Loan Agreement excluded disclosures, then that should have been apparent when the Robinsons reviewed and signed the document on February 20, 2020; nothing in the email hid that fact.  Nor could the email somehow conceal from the Robinsons the date they signed the contract.

The Robinsons also argue that equitable tolling applies because RiverHills either negligently or fraudulently "concealed the true transaction date" to pursue a statute-of-limitations defense.  Pls.' Opp'n Mem. [75] ¶ 10.  Again, it is unclear how RiverHills could conceal the date Plaintiffs themselves signed a document, especially one that twice states the transaction date.  If they are saying RiverHills fraudulently changed the date on the documents after they signed, then there is no evidence of that.  To the contrary, the Robinsons produced what they described as "a bona fide" copy of the contract before it was signed, *id.* ¶ 15, and that copy lists the same February 20, 2020 transaction date, *see* Copy of Loan Agreement [74-1] at 1.  The Court finds that Plaintiffs have established neither a misrepresentation that would allow tolling nor their diligence in pursuing a timely claim.  *See McCrimmon*, 516 F. App'x at 375 (affirming denial of equitable tolling and noting that "vague and conclusory allegations—that the defendants

concealed kickbacks and failed to inform [plaintiff] she could not afford the loans—do not set

forth rare and exceptional circumstances").

In sum, the Robinsons fail to offer record evidence casting doubt on RiverHills's claim

that the Loan Agreement was consummated on February 20, 2020.  RiverHills's evidence

establishes beyond peradventure that the transaction date was before March 17, 2020; as such,

the Robinsons' TILA claims are time barred.[4]

B.      ECOA Claims

According to the Robinsons, RiverHills should have raised their credit limit on their

HELOC to help them make the requisite escrow payment; instead, they say, the bank steered

them into a loan featuring a balloon payment[5] and a higher interest rate than it would have

afforded white or male applicants.  3d Am. Compl. [21] ¶¶ 11–12.  On this basis, they bring

ECOA claims.

> The Equal Credit Opportunity Act ("ECOA") was enacted, in relevant part, in
> order to "promote the availability of credit to all creditworthy applicants without
> regard to . . . the fact that all or part of the applicant's income derives from a
> public assistance program."  . . . 12 C.F.R. § 202.1.  The ECOA specifically

---

[4] Even if timely filed, the claims would still be subject to summary judgment on the merits.  The
Robinsons chiefly allege that RiverHills failed to disclose their right of rescission.  Pls.' Opp'n
Mem. [75] ¶ 18.  But that specific right does not apply to every credit agreement subject to
TILA—it is reserved for agreements in which the creditor "retain[s] or acquire[s]" an interest in
the debtor's principal dwelling.  15 U.S.C. § 1635.  The Loan Agreement was unsecured, and the
Robinsons cite no legal authority indicating that TILA would apply.  "'A complete failure of
proof concerning an essential element of the nonmoving party's case necessarily renders all other
facts immaterial' and 'mandates the entry of summary judgment' for the moving party."  *Alvarez
v. City of Brownsville*, 904 F.3d 382, 389 (5th Cir. 2018) (en banc) (quoting *United States ex rel.
Farmer v. City of Houston*, 523 F.3d 333, 337 (5th Cir. 2008)).  The Court notes that the parties
make additional arguments on the merits, but none would change the result.

[5] A balloon payment is a "final loan payment[,] usu[ally] much larger than the preceding regular
payments[,] . . . that discharges the principal balance of the loan."  *Balloon Payment*, *Black's
Law Dictionary* (11th ed. 2019).  As RiverHills points out, the 2020 loan, on its face, did not
feature a balloon payment.  It required 36 equal payments of $560.60.  (2020 Loan Agreement
[65-1] at 9); RiverHills's Mem. [66] at 17.  The Robinsons did not respond to this argument.

makes it illegal "for any creditor to discriminate against any applicant, with respect to any aspect of a credit transaction . . . because all or part of the applicant's income derives from any public assistance program."  15 U.S.C. § 1691(a)(2).

. . . .

To state a claim for relief under the ECOA, the plaintiffs must plausibly show that they were discriminated against in violation of the statute.  More specifically, the complaint must plausibly allege that (1) each plaintiff was an "applicant"; (2) the defendant was a "creditor"; and (3) the defendant discriminated against the plaintiff with respect to any aspect of a credit transaction on the basis of the plaintiff's membership in a protected class.

*Alexander v. AmeriPro Funding, Inc.*, 848 F.3d 698, 700 (5th Cir. 2017).

The Robinsons offer no direct evidence of discrimination; the claim is therefore circumstantial.  Circumstantial ECOA claims are typically addressed under the burden-shifting analysis adopted in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).  *See Moore v. U.S. Dep't of Agric. ex rel. Farmers Home Admin.*, 55 F.3d 991, 995 (5th Cir. 1995) (holding that plaintiffs were "entitled to bypass the *McDonnell Douglas* burden-shifting framework" because they presented direct evidence of discrimination); *see also Eustice v. JPMorgan Chase & Co.*, No. CV H-19-1489, 2020 WL 5541084, at *10 (S.D. Tex. Aug. 10, 2020) (holding that *McDonnell Douglas* applies to ECOA claims), *reconsideration denied*, 2020 WL 13411944 (S.D. Tex. Aug. 31, 2020).

Here, it does not appear that Plaintiffs surpass the prima facie stage of that analysis. Nevertheless, the Court will skip to the ultimate question:  whether the Robinsons can show that RiverHills's justification for their treatment is a pretext for discrimination.  Kaufman says RiverHills initially proposed raising the Robinsons' HELOC credit limit, but a title opinion revealed "intervening . . . judgment liens" assessed against the property that foreclosed that option.  Kaufman Aff. [65-1] ¶ 8.  Kaufman supports that contention by producing the title

14

opinion she obtained; it reflects two judgments and one assessment lien postdating the HELOC account's creation. *Id.* at 5–6 (Ex. A—Title Opinion ¶¶ 2, 4–7). And emails the Robinsons introduced into evidence are consistent with Kaufman's account. *See* Feb. 3 Kaufman Emails [74-7] at 1 (proposing an increase to the line of credit); Feb. 14 Kaufman Email [74-7] (informing Abby Robinson that the bank "cannot increase the [l]ine of credit because judgments and liens").

The Robinsons never address the intervening liens, focusing instead on events that predate the creation of their HELOC. Those events fail to rebut Kaufman's sworn statement that post-creation events prevented the bank from extending additional credit under the HELOC (as the bank had initially hoped). Nor do they speak to whether Kaufman made that decision for discriminatory reasons.

As to the interest rate charged on the 2020 Loan Agreement, RiverHills says the rate was set according to its "standard consumer loan interest rate chart in effect at the time." RiverHills's Mem. [66] at 5 (citing Kaufman Aff. [65-1] ¶ 10); *see* Kaufman Aff. [65-1] at 11–12 (Ex. C—2020 Consumer Rate Sheet). According to Kaufman, "The interest rates stipulated on this standard chart are applied to all customers regardless of race or gender . . . . The only adjustments made to the rates . . . are based on credit scores." Kaufman Aff. [65-1] ¶ 10. The chart in the record associates a $17,700 loan amortized over 3 years with a 9.19% interest rate, but it allows for specified reductions based on an applicant's credit score. *Id.* at 11–12 (Ex. C—2020 Consumer Rate Sheet). Kaufman says that Ricky Robinson's high credit score exceeded 660, which warranted a 0.7% reduction, so the interest rate charged was 8.49%. *Id.* ¶ 10; *accord id.* at 12 (Ex. C—2020 Consumer Rate Sheet).

The Robinsons say in response that RiverHills's summary-judgment "motion . . . is nothing short of a conclusion." Pls.' Opp'n Mem. [75] ¶ 31. That's not true; RiverHills supported its non-discriminatory reasons with record evidence and sworn declarations. In fact, RiverHills did more than required. "Where the non-movant bears the burden of proof at trial, 'the movant may merely point to the absence of evidence and thereby shift to the non-movant the burden of demonstrating by competent summary judgment proof that there is an issue of material fact warranting trial.'" *Nola Spice Designs, L.L.C. v. Haydel Enters.*, 783 F.3d 527, 536 (5th Cir. 2015) (quoting *Transamerica Ins. Co. v. Avenell*, 66 F.3d 715, 718–19 (5th Cir. 1995) (per curiam)). In the burden-shifting context, the movant need only articulate a non-discriminatory reason for its decision and "need not prove that it was actually motivated by its proffered reason." *Patrick v. Ridge*, 394 F.3d 311, 315 (5th Cir. 2004) (citation omitted). The non-movants, in contrast, must meet their burden by identifying "specific evidence in the record and []articulat[ing] precisely how this evidence supports [their] claim." *RSR Corp. v. Int'l Ins. Co.*, 612 F.3d 851, 857 (5th Cir. 2010) (citations omitted).

Turning to the Robinsons' cited evidence, they rely exclusively on two prior loans RiverHills issued to other Black debtors in 2014 and 2015. *See* Tedders Documents [74-10]; Durrell & Jackson Documents [74-11]. The Robinsons argue that the interest rates for those loans were "exorbitant" and "extremely high," thus proving a pattern and practice of discrimination that precludes summary judgment. Pls.' Opp'n Mem. [75] ¶¶ 31–32.

For starters, evidence regarding other Black debtors does not speak to the gender-discrimination claim, and there is no other evidence supporting it. As to the race-discrimination claim, the Robinsons offer no record evidence suggesting that the 2014 and 2015 loans were actually too high; arguments are no substitute for evidence. *TIG Ins. Co.*, 276 F.3d at 759. They

likewise offer no evidence that those rates were race-based, like comparative evidence indicating that RiverHills treated similarly situated non-Black borrowers more favorably.  *See Lee v. Kan. City S. Ry. Co.*, 574 F.3d 253, 259 (5th Cir. 2009).  So, even assuming a sufficient proximity in time, these older loans fail to show a pattern and practice of discrimination that could support the Robinsons' claims.

The Robinsons offer no other record evidence suggesting that RiverHills charged them anything other than the prevailing rates or that it discriminated against them based on race.  And, like with the loans to the other borrowers in 2014 and 2015, the Robinsons fail to identify a valid comparator as to their loan in 2020.  *Id.*  Accordingly, Plaintiffs have not rebutted RiverHills's non-discriminatory reasons for its decisions.

C.     Foreclosure and Eviction Moratoria

The Robinsons assert that RiverHills's foreclosure and eviction efforts violated federal foreclosure and eviction moratoria.  Starting with foreclosure, RiverHills argues in its opening memorandum that the Robinsons' Complaint failed to identify a foreclosure moratorium that was supposedly violated; it then explained why the then-existing foreclosure moratorium was inapplicable.  RiverHills's Mem. [66] at 20–21.  The Robinsons declined to address those arguments and focused instead on the eviction moratorium claim.  Summary judgment is therefore granted as to any foreclosure-moratorium-related claims on the merits and because the Robinsons abandoned the claims.  *See Terry Black's Barbecue, L.L.C. v. State Auto. Mut. Ins. Co.*, 22 F.4th 450, 459 (5th Cir. 2022) ("A plaintiff abandons claims when it fails to address the claims or oppose a motion challenging those claims.").

As to the eviction moratorium, the Robinsons' Complaint pointed to the moratorium imposed by the CARES Act, 15 U.S.C. § 9058.  3d Am. Compl. [31] ¶ 39.  Although the

relevant statutory provision was no longer in effect as of February 2021 (when the unlawful-entry-and-detainer action was initiated), *see* 15 U.S.C. § 9058(b), the Centers for Disease Control and Prevention had extended the moratorium through March 31, 2021, 86 Fed. Reg. 8020, 8020 (Feb. 3, 2021).  RiverHills filed its detainer March 3, 2021.

The CDC extension provided that a "person with a legal right to pursue eviction or possessory action[] shall not evict any covered person from any residential property in any jurisdiction to which this Order applies during the effective period."  86 Fed. Reg. at 8020. "Residential property" is defined as "any property *leased* for residential purposes."  *Id.* at 8021 (emphasis added).  A person is considered "covered" only if they provide the would-be evictor with a declaration under penalty of perjury indicating their compliance with a variety of restrictions.  *Id.* at 8020.

Notably, the United States Supreme Court eventually vacated a stay of a district-court decision striking down the moratorium.  *Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 141 S. Ct. 2485, 2490 (2021) (per curiam).  But assuming the CDC extension was ever valid, the Robinsons have offered no evidence suggesting that they leased their residence following foreclosure or that they provided the required declaration.  Nor have they directly addressed RiverHills's legal arguments regarding those requirements, and they offer no legal authority supporting their moratorium-based claim.  Because the Robinsons have not created a genuine issue as to whether the moratorium barred RiverHills's action, RiverHills is entitled to summary judgment.[6]

---

[6] The Robinsons briefly touch on a new cause of action in their opposition memorandum, suggesting that their "wrongful eviction" amounts to a "malicious prosecution."  Pls.' Opp'n Mem. [75] ¶ 41.  Even assuming they could raise such a claim in this posture, *see Pierce v. Hearne Ind. Sch. Dist.*, 600 F. App'x 194, 200 & n.6 (5th Cir. 2015) (per curiam), the cause of

D.      Fourteenth Amendment

The Robinsons' only other federal claim asserts that the eviction efforts violated their

Fourteenth Amendment rights.  But only "state action [is] subject to Fourteenth Amendment

scrutiny; . . . private conduct (however exceptionable) . . . is not."  *Brentwood Acad. v. Tenn.*

*Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295 (2001) (compiling cases).  Other than noting

that RiverHills is "chartered by the State of Mississippi," Pls.' Opp'n Mem. [75] ¶ 25, which is

plainly not enough, the Robinsons provide no basis for finding "such a 'close nexus between the

State and the challenged action' that seemingly private behavior 'may be fairly treated as that of

the State itself,'" *Brentwood*, 531 U.S. at 295 (quoting *Jackson v. Metro. Edison Co.*, 419 U.S.

345, 351 (1974)).  The Constitutional claims are dismissed.

IV.     Jurisdictional Analysis of State-Law Claims

The Robinsons allege state-law fraud against RiverHills and further claim that RiverHills,

Watts, and LSG are responsible for torts Watts committed while serving process.  They ask the

Court to exercise supplemental jurisdiction over these state-law claims, but Defendants say the

Court should decline.

Title 28 U.S.C. § 1367(a) grants district courts supplemental jurisdiction over claims that,

with any original-jurisdiction claims, form part of the "same case or controversy."  *See generally*

*Mitchell v. Bailey*, 982 F.3d 937, 943 (5th Cir. 2020).  But "[e]ven if supplemental jurisdiction is

proper, a court may decline to exercise it.'"  *Lucky Tunes #3, L.L.C. v. Smith*, 812 F. App'x 176,

183 (5th Cir. 2020) (per curiam) (citing *Enochs v. Lampasas County*, 641 F.3d 155, 159 (5th Cir.

2011)).

action derives from state law, so, for the reasons discussed below, the Court declines
supplemental jurisdiction.

Notably, § 1367(c) provides that a "district court[] may decline to exercise supplemental jurisdiction over a claim . . . (3) if the district court has dismissed all claims over which it has original jurisdiction . . . ."

> Whether a district court abuses its discretion after § 1367(c)(3) has been satisfied depends on "common law factors of judicial economy, convenience, fairness, and comity." [*Enochs*, 641 F.3d at 159.] [T]he general rule [is] that "a court should decline to exercise jurisdiction over remaining state-law claims when all federal-law claims are eliminated before trial." [*Brookshire Bros. Holding, Inc. v. Dayco Prods., Inc.*, 554 F.3d 595, 599 (5th Cir. 2009)].

*Heggemeier v. Caldwell County*, 826 F.3d 861, 872 (5th Cir. 2016).

In this case, the Court has dismissed every original-jurisdiction claim. *Supra* Part III. What remains are state-law claims, several of which seem novel. "As the Supreme Court has emphasized, '[n]eedless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law.'" *IntegraNet Physician Res., Inc. v. Tex. Indep. Providers, L.L.C.*, 945 F.3d 232, 243 (5th Cir. 2019) (quoting *Parker & Parsley Petroleum Co. v. Dresser Indus.*, 972 F.2d 580, 585 (5th Cir. 1992)), *overturned on other grounds*, *Latiolais v. Huntington Ingalls, Inc.*, 951 F.3d 286 (5th Cir. 2020) (en banc). Finally, the Court notes that discovery as to the service-related claims has been stayed, Order [88], meaning that the inconvenience to the parties should be relatively low. Given the minimal prejudice and the nature of the state-law claims, the Court finds that the general rule fits this case. Plaintiffs' state-law claims are dismissed without prejudice.

V.      Conclusion

The Court has considered the briefings in full; arguments not addressed would not change the result. Both motions [39 and 65] are granted to the extent that the federal claims are

dismissed with prejudice and the state-law claims are dismissed without prejudice on jurisdictional grounds.  A separate judgment will be entered.  *See* Fed. R. Civ. P. 58.

    **SO ORDERED AND ADJUDGED** this the 16th day of August, 2022.

s/ *Daniel P. Jordan III*
CHIEF UNITED STATES DISTRICT JUDGE